## NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2023 CJ 1166

## STATE OF LOUISIANA IN THE INTEREST OF
## C.S., L.K., AND R.K.

*DATE OF JUDGMENT:*    FEB 2 3 2024

ON APPEAL FROM THE CITY COURT OF EAST ST. TAMMANY PARISH,
JUVENILE DIVISION
STATE OF LOUISIANA
NUMBER 2023 JS 1557

HONORABLE BRYAN D. HAGGERTY, JUDGE

* * * * * *

| | |
|---|---|
| D. Rex English<br>Slidell, Louisiana | Counsel for Appellee<br>State of Louisiana |
| Julie Miramon Knight<br>Covington, Louisiana | Counsel for Appellee<br>Department of Children and Family<br>Services |
| Destinee Prout<br>Mandeville, Louisiana | Counsel for Appellees<br>C.S., L.K. and R.K.J. - Minor<br>Children |
| Sarabeth T. Bradley<br>Covington, Louisiana<br>Annette Fuller Roach<br>Lake Charles, Louisiana | Counsel for Appellant<br>S.S. - Father |

* * * * * *

BEFORE: GUIDRY, CJ, CHUTZ, AND LANIER, JJ.

Disposition: AFFIRMED.

**CHUTZ, J.**

S.S., appellant and the biological father of C.S.,[1] appeals the city court's judgment of disposition and final order of guardianship granted to C.S.'s maternal grandparents, B.S. and J.S., and awarding specific visitation to S.S. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 1, 2023, the State of Louisiana (State) through the Department of Children and Family Services (DCFS) received a report that three children were without a legal caretaker as a result of the death of their parents, A.S. and R.K., by an apparent murder/suicide. The eldest child, 13-year-old C.S., is the biological child of A.S. and S.S. Seven-year-old L.K. and two-year-old R.J.K. are the biological children of A.S. and R.K. C.S. and L.K. were present in the family home when the murder/suicide occurred. DCFS learned that C.S. called 911 and advised that his parents were not responsive and bleeding. He stated to authorities that R.K. had moved out of the family home a couple months before the murder/suicide and "could not deal with the break up." On April 3, 2023, the children were placed in the State's custody.

When first interviewed, C.S. told DCFS that he wanted to go back to Russellville, Arkansas to live with B.S. and J.S. with whom he had lived for seven years prior to moving to St. Tammany Parish with his mother. C.S. was placed with A.T., a neighbor, for the first six days after the deaths of A.S. and R.S. and then, along with L.K., went to the home of B.S. and J.S. in Arkansas for a 30-day visit. R.J.K. remained in the care of his paternal grandmother in New Orleans.

As a result of contact with S.S., who also resides in Russellville, Arkansas, DCFS learned that he had not been in C.S.'s life for ten years. DCFS noted that S.S. said A.S. had made it difficult for him to maintain contact with his son and

---

[1] The initials of the minor children, parents, and certain other adults will be used in this opinion to protect the privacy of the parties involved. See La. U.R.C.A. Rules 5-1 and 5-2.

that it was easier to let A.S. and C.S. live their lives without him. S.S. also had a criminal history including substance abuse with his most recent arrest having occurred in 2021 and for which he was on felony probation at the time of the deaths of A.S. and R.K. C.S. reported that he had only seen S.S. one time in his life and was unable to provide S.S.'s name to DCFS. S.S. admitted that he did not call C.S. and had not paid child support.

A case plan was fashioned on May 1, 2023, wherein the basic obligations of S.S. consisted of several actions including substance abuse and mental health evaluations, maintenance of stable housing, enrollment in parenting classes, payment of $25.00 in monthly child support, and continued employment. S.S. subsequently filed an objection to the case plan, complaining of the requirement of a mental health evaluation.

After a disposition hearing on May 9, 2023, B.S. and J.S. were granted guardianship of L.K. The matter of L.K. was closed without further review. An evaluation on R.J.K.'s placement and attachment bond with his paternal grandmother and a caregiver assessment of B.S. and J.S. were undertaken by Tulane Comprehensive Assessment Treatment Team, which included an interview of C.S. After a disposition hearing on May 25, 2023, B.S. and J.S. were granted guardianship of R.J.K.

On June 6, 2023, an adjudication hearing was held as to C.S. After the presentation of testimonial evidence, including that of C.S., the city court adjudicated C.S. as a child in need of care (CINC) and set the matter for a disposition hearing, which was held on June 13, 2023.[2]

After the presentation of evidence, which included a confidential report on B.S. and J.S., the city court ruled from the bench. In conformity with its oral ruling, the city court signed a judgment on July 27, 2023, granting B.S. and J.S.

---

[2] Judge Elaine W. Demiceli presided pro tempore at the adjudication hearing.

3

guardianship of C.S. and awarding specific and substantial visitation to S.S.[3] S.S. appeals.

## DISCUSSION

### Standard of Review:

In cases involving the custody of children, the city court is vested with a vast amount of discretion. The city court is in a better position to evaluate the best interest of a child because of its superior opportunity to observe the parties and the witnesses who testified at the trial. It is well settled that an appellate court cannot set aside a city court's findings of fact in the absence of manifest error or in the clearest case of abuse of the city court's great discretion. The two-part manifest error test considers: (1) whether there is a reasonable factual basis in the record for the finding; and (2) whether the record further establishes that the finding is not manifestly erroneous. If a reasonable factual basis exists, an appellate court may set aside a city court's factual finding only if, after reviewing the record in its entirety, it determines the city court's finding was clearly wrong. Moreover, where factual findings are based on determinations regarding the credibility of witnesses, the trier of fact's findings demand great deference and are virtually never manifestly erroneous or clearly wrong. Even though an appellate court may feel that its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *State in Int. of A.S.*, 2019-0248 (La. App. 1st Cir. 9/4/19), 285 So.3d 1129, 1140.

---

[3] The city court awarded visitation to S.S. in three phases. During Phase I, which was for the first 60 days, S.S. had visitation of C.S. for one weekend per month with no overnight visits. During Phase II, which was for the following 60 days, S.S. had visitation for two weekends per month, which included overnight visits on Fridays through Sundays. Phase III included the schedule set forth in Phase II and additional times at C.S.'s guardians' discretion.

4

**CINC Determination:**

S.S. first complains that the city court manifestly erred in concluding that C.S. was a CINC.[4] Noting that the petition fails to specifically assert actions constituting abandonment, S.S. maintains that the record lacks evidence to support the city court's CINC conclusion.

La. Ch.C. art. 606 requires that allegations that a child is in need of care assert one or more of the enumerated grounds which the State must prove by a preponderance of the evidence. *State in Int. of A.S.*, 285 So.3d at 1139. Insofar as C.S., Article 606(A) states:

> (3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.

Preliminarily, we find no merit in S.S.'s contention that the petition fails to specifically assert actions constituting abandonment. A CINC petition must only allege "facts demonstrating grounds for adjudicating the child [as] in need of care." Moreover, nothing prohibits the parties from offering additional evidence relevant to the CINC adjudication and the child's safety. *State in Interest of M.N.*, 2021-0634 (La. App. 5th Cir. 1/7/22), 336 So.3d 996, 1005, writ denied, 2022-00255 (La. 3/15/22), 334 So.3d 393.

Here, the petition cross-referenced the affidavit in support of the Instanter Order. The affidavit established that upon the deaths of A.S. and R.K., the children, including C.S., were without any caretakers. To C.S., his biological father

---

[4] S.S. has correctly pointed out that the city court did not sign a judgment in conformity with its ruling that C.S. was a CINC after the adjudication hearing. Because the appealed judgment expressly provides that "by clear and convincing evidence presented ... [C.S.] has been adjudicated a [CINC]," we find S.S.'s challenge of the city court's CINC conclusion is properly reviewed. See and compare *State in Int. of G.O.*, 2021-154 (La. App. 3d Cir. 6/9/21), 322 So.3d 869, 873-74 (appellate court converted mother's appeal from the denial of her motion to dismiss to an application for supervisory writs, regarding neglect and dependency petition where no formal judgment was entered but record included State's filings as to CINC allegations, supporting affidavits, and transcript from CINC hearing, which reflected trial court's rulings on both adjudication and motion to dismiss).

was a stranger, since C.S. recalled only having seen S.S. once. And S.S. admitted he neither maintained contact with C.S. nor paid child support for C.S.'s care. With the loss of his mother and stepfather, C.S. was, therefore, without necessary food, clothing, shelter, medical care, or supervision due to the untimely deaths of A.S. and R.K. and the disappearance or prolonged absence of S.S. Thus, on the face of the petition, sufficient facts have been alleged to support the grounds set forth in Article 606(A)(3).

S.S.'s contention that his presence, commencing on the evening of April 1, 2023 and at every subsequent proceeding involving C.S.'s custody, demonstrates that DCFS cannot show he is a continuing absent parent as required under Article 606(A)(3) is without merit. It is undisputed that C.S. and S.S. did not have a meaningful or substantial connection as of April 1, 2023. From the first interview immediately after the deaths of A.S. and R.K., C.S. consistently requested to live with his maternal grandparents although he was amenable to becoming more familiar with his biological father.

Additional evidence at the adjudication hearing established that DCFS was without any knowledge of the background of S.S. who is an Arkansas resident. At the hearing, a supervisor with DCFS testified that C.S. told her that on his birthday shortly before his parents' deaths, he used R.K's phone to contact S.S., but C.S. clarified that it was S.S. who called him on R.K.'s phone, and R.K., in turn, gave the phone to C.S. to speak to S.S. Despite that recent phone call, C.S. was unable to provide DCFS with any contact information for S.S., and C.S. further admitted that when DCFS workers first interviewed him, he did not know S.S.'s full name. Additionally, S.S. admitted he was on felony probation in the State of Arkansas for possession of a dangerous weapon (brass knuckles) and a controlled dangerous substance.

6

Based on the evidence adduced at the June 6, 2023 hearing, a reasonable factual basis exists to support the city court's adjudication of C.S. as a CINC under La. Ch. Code art. 606(A)(3). Accordingly, the city court was not manifestly erroneous.

**Guardianship Disposition:**

S.S. also challenges the city court's disposition insofar as its grant of guardianship of C.S. to B.S. and J.S. S.S. maintains the city court was manifestly erroneous in concluding that immediate guardianship to B.S. and J.S. was the least-restrictive placement alternative and in the best interest of C.S. In so contending, S.S. asserts that the record lacks sufficient evidence to support a finding that DCFS made reasonable efforts to reunite him with C.S.

The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by DCFS. La. Ch.C. art. 718(A). It is intended to ensure that the fundamental needs of children are met and the constitutional rights of all parties are recognized and enforced. La. Ch.C. art. 718(B). *State in Int. of M.N.*, 2023-0174 (La. App. 1st Cir. 6/23/23), 370 So.3d 744, 748, writ denied, 2023-00947 (La. 9/6/23), 369 So.3d 1269.

The court must determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with certain priorities of placement, guardianship being below reunification and adoption. La. Ch. Code art. 702(C). In most permanent plan determinations, the court is required to

7

determine whether DCFS has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The paramount concern in the court's determination of the permanent plan is the child's health, welfare, and safety. La. Ch.C. art. 702(E). More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in Int. of M.N.*, 370 So.3d at 748-49.

After a child has been adjudicated to be in need of care, DCFS may submit a case plan along with the case review report to the court and all counsel of record recommending guardianship. La. Ch.C. art. 720(A). According to La. Ch.C. art. 722(A), a mover for guardianship shall have the burden of proving all of the following by clear and convincing evidence:

(1) The child has been adjudicated to be in need of care.

(2) Adoption is not in the best interest of the child and the child cannot be safely reunified with the parent within a reasonable time.

(3) The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.

(4) The proposed guardian is able to provide a stable and safe home for the child for the duration of minority.

In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch.C. art. 702(C)(1). Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. *State in Int. of M.N.*, 370 So.3d at 749.

The record shows DCFS focused on C.S.'s request to be with his grandparents and his siblings, who resided with B.S. and J.S. in their home in Russellville, which is located close to S.S.'s residence. In seeking a permanent

placement with B.S. and J.S. as guardians, DCFS supervisor Trina Gibson testified that the decision was based on the unusual circumstances that led to C.S.'s displacement with an emphasis on the child's need for permanency given that he had been "extremely traumatized."

Gibson further testified that for S.S. to obtain a custodial arrangement, he has to work on his case plan in Louisiana. Therefore, while his siblings reside in Russellville, Arkansas, C.S. would have to remain in Slidell, Louisiana until an assessment of S.S. could be conducted which Gibson described as "an indefinite amount of time." Since C.S.'s return to Louisiana from the 30-day visit at his grandparents' home during April and May 2023, he has stayed in the home of neighbor A.T. where C.S. requested to stay if he could not stay with his grandparents. Although the arrangement has worked well, the proximity of A.T.'s residence to the crime scene was an obvious concern for C.S.'s healing. Additionally, to move to Arkansas, an Interstate Compact for the Placement of Children (ICPC)[5] for both S.S. and the maternal grandparents had to be undertaken, a process that DCFS representatives stated could take several months.

The evidence also showed that S.S.'s felony probation constituted a temporal legal impediment to a quick working through of his case plan. According to the terms of his probation, which were in place at the time of the disposition hearing, S.S. was not able to leave the State of Arkansas through September 2023 without a travel pass from his probation officer, further delaying the commencement of the time-consuming process.

J.S. testified that he supported visitation between S.S. and C.S., and that B.S. and J.S. were "more than willing" to have S.S. in their home and would work with S.S. to expand visitation as long as C.S. was safe. J.S. also indicated that he supported telephone communications between C.S. and S.S. Additionally, the city

---

[5] See generally La. Ch.C. arts. 1623-1624.

court was privy to an evaluation of R.J.K.'s placement in which C.S. was interviewed. C.S. advised the Tulane Comprehensive Assessment Treatment Team that during the seven years he resided with B.S. and J.S., including while his mother worked evening and overnight shifts, he felt very comfortable around them. C.S. described his relationship with his maternal grandparents as loving.

The record shows that within a week of the deaths A.S. and R.K., C.S. was with his maternal grandparents in Russellville where S.S. visited with C.S. "whenever he pleased." DCFS has been committed to maximum visitation. When C.S. returned to Louisiana after 30 days, in light of the distance between Russellville and Slidell, a bi-weekly visitation schedule was set up. S.S. acknowledged that DCFS accommodated him with visitation, indicating he comes to visit C.S. as often as he can. He testified that on more than one weekend, DCFS provided a worker to supervise visitation. A.T. also testified that she has facilitated visitation between C.S. and his biological father.

In addition, DCFS supervisor Gibson explained that to provide additional services to S.S. to allow him to comply with his case plan in Arkansas, an ICPC was required and had to be accepted by Arkansas. But an ICPC could not be started until after C.S.'s adjudication, which had not occurred until June 6, 2023.[6]

Given the particular facts and circumstances of how C.S. came to be adjudicated a CINC, we cannot say the city court was manifestly erroneous in concluding DCFS made reasonable efforts toward reunification. DCFS instituted visitation within a short period of time and facilitated interactions between C.S. and S.S. The impediments caused by the interstate distance between S.S. and C.S. as well as the need for an ICPC to assist S.S. in complying with his case plan were

---

[6] At a status conference on May 30, 2023, a DCFS representative advised the city court that an expedited ICPC takes months and typically applies only to children under two years of age.

not obstacles created by DCFS or a result of its inaction. The evidence shows that the health, welfare, and safety of the child was DCFS's paramount concern.

In his appellate challenge of the city court's disposition granting guardianship to B.S. and J.S., S.S. overlooks the effect the ten-year period that he had no involvement in his son's life had on C.S. Nothing but time can repair the void. But C.S., who will be a major in less than five years, continues to have a need for stability and permanency. The other important concern for C.S. is to have the presence of his siblings with him in the same household, which will assist him (and his siblings) in the healing process. Continued temporary placement with A.T., in close proximity to the crime scene, to process an ICPC while S.S. complies with his case plan and develops a relationship with C.S. every other weekend offers limited stability, no permanency, and is simply not in C.S.'s best interest.

Based on our review of the record, we conclude DCFS proved by clear and convincing evidence that reunification with S.S. was not possible within a reasonable time and that guardianship with J.S. and B.S. was the least restrictive placement and in C.S.'s best interest. Mindful of the traumatic manner by which C.S. became a CINC, we cannot say the city court was manifestly erroneous in granting guardianship to B.S and J.S.

**DECREE**

For these reasons, the city court's judgment of disposition and final order of guardianship of C.S. to B.S. and J.S. is affirmed. Appeal costs are assessed against appellant-father, S.S.

**AFFIRMED.**

11